FILED

2021 Dec-30  PM 01:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **MICHAEL SHINE, TONY ELLIS, and LEWIS THOMAS,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 2:18-CV-2093-CLM** |
| **THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA,** | ) ) ) ) | |
| **Defendant.** | ) ) | |

## <u>MEMORANDUM OPINION</u>

Michael Shine sued his former employer, The Board of Trustees of the University of Alabama ("UAB"), alleging race discrimination and retaliation under Title VII, 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981. UAB moved for summary judgment (doc. 63) and to strike Shine's expert designation and report (doc. 76). For the reasons below, the Court **GRANTS** the motion for summary judgment and **DENIES AS MOOT** the motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court draws the facts from the summary-judgment record. At this stage, "[a]ll evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021).

### I.   Factual Background[1]

Michael Shine is an African-American man with a bachelor's degree in marketing and a master's degree in business administration. (Docs. 66-1 at 15–16).[2] UAB hired Shine in January 2017 as the Manager of IT Business Services, a newly created position. (Docs. 68 at 4 ¶ 4, 72 at 3 ¶ 4). In that role, Shine oversaw the day-to-day operation and administration of customer-support functions for the IT Department. (Docs. 68 at 4 ¶ 7, 72 at 4 ¶ 7). And his chief task was to manage the processes for renewing existing IT contracts and requesting new IT contracts for UAB's departments and entities. (Docs. 68 at 4 ¶ 7–8, 72 at 4 ¶ 7–8). Those contracts—for example, the Microsoft contract that allowed everyone on campus to

---

[1] For many facts, Shine contends that the Court should disregard UAB's employees' testimonies because they are "interested witnesses." (*See, e.g.*, Doc. 72 at 1–2 ¶ 1). But repeating this contention (eight times) does not dispute the facts asserted by UAB's witnesses. And the Court will not ignore their uncontroverted testimonies at the summary-judgment stage. *See, e.g.*, *Woods v. Delta Air Lines Inc.*, 595 F. App'x 874, 879 (11th Cir. 2014) ("[U]nder Rule 56, a party may support a motion for summary judgment with, among other things, affidavits or declarations, and there is no requirement that these sworn statements be from disinterested witnesses. Once the moving party does so, the nonmoving party bears the burden to produce evidence to dispute the facts averred in the sworn statement." (citations omitted)).

[2] In his April 2021 deposition, Shine testified that he was (and presumably still is) pursuing a doctorate of business administration. (Doc. 66-1 at 16).

use Microsoft applications—"were an integral part of supporting UAB." (Docs. 68 at 5 ¶ 9, 72 at 4 ¶ 9).

1. <u>Shine's Performance</u>: No one complained about Shine's performance in his first year (2017). (Docs. 68 at 5 ¶ 10, 72 at 4 ¶ 10). In 2018, an African-American woman named Laquita Graham became the IT Department's Director of Finance and Shine's direct supervisor. (Docs. 66-1 at 72, 68 at 5 ¶ 11, 72 at 4 ¶ 11). Soon after, Graham heard complaints from customers (departments and entities at UAB) about Shine's "untimely routing and review of contracts." (Docs. 66-11 at 3 ¶ 4, 68 at 5 ¶ 12).[3] Graham says she found that Shine "was not ensuring vendor contract were timely renewed, was not properly monitoring the routing of contracts, and was not ensuring proper processes were in place for contract review and renewal." (Doc. 66-11 at 3 ¶ 4). So, on May 15, 2018, Graham issued Shine a verbal warning—which, at Shine's request, she put into writing—and placed him on a 60-day Personal Improvement Plan (PIP). (Docs. 66-1 at 71, 66-2 at 35–36 (warning), 66-2 at 45–46

---

[3] Shine tried to dispute the existence and veracity of the complaints (doc. 72 at 4–5 ¶¶ 12–14), calling them "phantom" complaints. (Docs. 66-1 at 72, 72 at 18). In his summary-judgment brief, he cited an email that he sent to Graham (after they had a meeting), in which he acknowledged the complaints' existence and asked Graham for the complainants' identities. (Doc. 66-2 at 32–33). But the email does not suggest that UAB fabricated the complaints. Shine also cited his own deposition testimony that the complaints were "phantom or made-up information." (Doc. 66-1 at 72). But "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018). Moreover, later in his deposition, Shine acknowledged that other UAB employees lodged "[c]omplaints about the process of everything, how the flow of the contracts go," and that "[t]hey didn't like the flow of contracts because they were taking too long." (Doc. 66-1 at 102). So the Court finds that Shine has not *genuinely* disputed UAB's factual assertion that Graham learned about authentic complaints about Shine's performance.

(PIP), 68 at 6 ¶ 16, 72 at 5 ¶ 16). The warning charged Shine with "failure to provide guidance on agreement options" and "[f]ailure to identify expired or expiring agreements and ensure timely renewals resulting in the risk of losing software." (Doc. 66-2 at 35).

Once the PIP period drew to a close in July 2018, Graham met with Shine again and gave him a memo detailing UAB's expectations for Shine going forward. (Doc. 66-2 at 49–50). The memo explained that Shine completed the PIP but "only with prompting for meetings and participation from [Graham] and [the] HR representative." (*Id.* at 49). The memo then set out expectations and warned that Shine's failure to meet those expectations could lead to more discipline. (*Id.* at 50).

According to UAB, Shine's performance problems continued. (Doc. 68 at 8 ¶ 24). In September, Graham prepared a written warning that explained her dissatisfaction with Shine's untimeliness. (Doc. 66-14 at 16–17). The warning referenced more customer complaints about Shine's failure to respond timely to requests. (*Id.* at 16). And it discussed Shine's failure to execute his responsibilities for an agreement with Gartner, Inc. (*Id.*).

On October 1, before Graham issued the written warning, the high-priority "Microsoft Premier" contract for 2018 lapsed. (Docs. 66-1 at 137–38, 68 at 8 ¶ 26). This lapse impacted Microsoft software licensing across the entire university. (Docs.

66-1 at 64, 68 at 8 ¶ 26).

UAB blamed the lapse on Shine's failure to ensure timely renewal. (Doc. 66-11 at 4 ¶ 6, 68 at 8 ¶ 26). Shine countered that he never received the contract because of a technical problem with his email. (Docs. 66-2 at 64, 68 at 9–10 ¶ 32, 72 at 8 ¶ 28). And he testified that a UAB employee confirmed that he didn't receive the contract and that UAB did nothing to investigate. (Docs. 66-1 at 125, 66-1 at 157, 72 at 8 ¶ 28). But UAB says that it "undertook a thorough investigation" and found that "no such [technical] failure occurred." (Doc. 66-13 at 5–6, 68 at 10 ¶ 33).

After that, UAB suspended Shine (docs. 66-1 at 144, 68 at 9 ¶ 30) and asked him to provide a written account of the 2018 Microsoft Premier and Gartner Inc. contract issues. (Doc. 66-1 at 157, 66-2 at 167). In his account, Shine blamed the Microsoft lapse on the error with his email. (Doc. 66-2 at 64). And he said that he was not to blame for any problems with the Gartner contract. (*Id.* at 65).

UAB fired Shine in November 2018. (Doc. 66-2 at 67–68). In a termination letter, UAB detailed its dissatisfaction with Shine's performance related to the Microsoft and Gartner agreements. (*Id.* at 67). And the letter charged Shine with inexcusable neglect, negligence, and unsatisfactory job performance. (*Id.* at 68).

2. Shine's allegations against UAB: Shine says that UAB fired him for a different reason: He complained about "racial disparities in promotions and pay" to

5

Dr. Curtis Carver, the head of the IT Department. (Doc. 72 at 8 ¶ 30, *id.* at 17). Shine testified that, during a "meeting with everyone in the department" in May 2018, he raised concerns that some IT employees make more money than others because they have an "ENT" designation in their job title. (Doc. 66-1 at 67–69).[4] But no record evidence suggests that Shine raised any *racial* issue during that meeting. And Kendra Thompson testified: "I recall being in a meeting with Mr. Shine and [Dr.] Carver and the rest of the business operations team, and I recall Mr. Shine raising questions and concerns regarding ENT titles. I do not recall race or race-based anything being mentioned in that meeting to Dr. Carver." (Doc. 66-9 at 148).

Shine also contends that several superiors—Robert Howard, Scott Sorenson, and Kathy Litzinger—discriminated against him. (Docs. 68 at 10 ¶ 37, 72 at 10 ¶ 37). He says that Howard offended him by calling him a "diva," which Shine interpreted as a remark about his sexuality. (Docs. 68 at 11 ¶ 38, 72 at 11 ¶ 38). He says Sorenson offended him by commenting that another African-American

---

[4] Kathy Litzinger, the Executive Director of IT Business Operations, testified that the ENT designation (meaning "enterprise") refers to employees who provide IT support services to faculty, staff, and students across the entire campus. (Doc. 66-7 at 76–77). She also said that the ENT positions include a technical skillset that sometimes correlates to higher pay ranges. (*Id.* at 77–78). By contrast, she explained, IT employees who support only a specific unit or school do not have an ENT designation. (*Id.*). And employees like Shine who work "[i]n business operations" and serve "customers without a technical component" do not have such designations. (*Id.* at 78).

Kendra Thompson, a "Personnel Generalist," testified similarly. She said that the "enterprise titles are technical positions and they were created to differentiate our technical roles in UAB IT from distributed IT roles, or things that people do specifically within IT that are not done across the campus." (Doc. 66-9 at 149). The ENT designations "differentiate what's in IT from across the university because they are specifically potentially supporting larger systems or more customers in supporting the University as a whole." (*Id.* at 150).

Shine testified that he doesn't know what differentiates ENT and non-ENT employees. (Doc. 66-1 at 73).

employee was not experiencing the same work-related problems with another employee that Shine was experiencing. (Doc. 68 at 11 ¶ 39, 72 at 11 ¶ 39). And he says Litzinger: (1) was a catalyst for his discrimination; (2) was the decision-maker behind his discipline and termination; and (3) made a discriminatory (or at least unfair) remark to Shine that he caused a "mess" by complaining about the ENT designations. (Docs. 66-1 at 166, 68 at 11 ¶ 40, 72 at 11 ¶ 40).

Lastly, Shine contends that UAB lacks a "viable pay and promotion system" for African-Americans. (Docs. 66-1 at 7, 68 at 11 ¶ 42, 72 at 11 ¶ 42). And he says that UAB discriminated against him in pay and promotions by treating less-educated white employees more favorably than him. (Docs. 68 at 12 ¶ 44, 72 at 11 ¶ 44).

## II.    Procedural Background

Shine filed to discrimination charges with the Equal Employment Opportunity Commission. He filed his first charge in May 2018, after the verbal warning, for race discrimination in pay and promotions. (Doc. 1-1). And the EEOC sent Shine a notice of suit rights in September 2018. (*Id.*). Shine then filed a second charge in November 2018, after his termination, claiming race discrimination and retaliation. (Doc. 66-2 at 71). The record contains no evidence of a second notice from the EEOC.

Shine sued UAB and Kathy Litzinger in December 2018. (Doc. 1). He amended his complaint three times—to correct pleading deficiencies, to add co-

plaintiffs, and to add class allegations. (Docs. 11, 18-1, 32). The third amended complaint raises three claims. First, a Title VII disparate-treatment claim against UAB for race discrimination "with regards to promotions, pay[,] and other terms and conditions of employment." (Doc. 32 at 20). Second, a claim for race discrimination and retaliation under the Equal Protection Clause and 42 U.S.C. § 1983. (*Id.* at 21). And third, a Title VII disparate-impact claim against UAB. (*Id.* at 23). Shine also appears to raise identical claims against UAB under 42 U.S.C. § 1981. (*Id.* at 2).[5] The Court has dismissed all claims against Litzinger. (Docs. 47, 62). So all that remains are the claims against UAB.

UAB filed a motion for summary judgment on Shine's claims. (Docs. 63, 68, 79). Shine opposes summary judgment. (Doc. 72). To support his opposition, Shine produced an expert report with statistical evidence about pay and promotion in UAB's IT Department between 2014 and 2020. (Doc. 72-1). And UAB has moved to strike the expert report. (Doc. 76).

---

[5] Section 1981 does not provide for suits against state actors. *Bryant v. Jones*, 575 F.3d 1281, 1287 n.1 (11th Cir. 2009). The Court therefore dismisses Shine's Section 1981 claims against UAB for lack of jurisdiction.

## STANDARD OF REVIEW

The Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material if its resolution "might affect the outcome of the suit." *Id.* To survive a "properly supported motion for summary judgment, [the nonmovant] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox*, 903 F.3d at 1213.

## DISCUSSION

The Court divides its discussion into three main parts: (1) disparate treatment, (2) retaliation, and (3) disparate impact. For the reasons below, the Court grants UAB's motion for summary judgment on all counts. (Doc. 63).

## I.    Disparate Treatment

In his third amended complaint, Shine alleged that UAB discriminated against him "with regards to promotions, pay[,] and other terms and conditions of

employment because of [his] race." (Doc. 32 at 20 ¶ 65). In his summary-judgment briefing, Shine clarified and narrowed the scope of his disparate-impact claim: UAB discriminated against him in pay based on his race. (Doc. 72 at 16–17).[6]

For any Title VII disparate-impact claim, the plaintiff "has the burden of persuading the trier of fact that the defendant has committed intentional discrimination." *Lincoln v. Bd. of Regents of Univ. Sys. of Ga.*, 697 F.2d 928, 936 (11th Cir. 1983). The plaintiff "can do so in a variety of ways, one of which is by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc). Other ways to satisfy this burden are to "present direct evidence of discriminatory intent, or demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1220 n.6 (citations omitted).

In his summary-judgment opposition, Shine tries to skirt the *McDonnell-Douglas* framework. He contends, correctly, that *McDonnell-Douglas* "is not the only way to prove discrimination." (Doc. 79 at 15). From there, he says that

---

[6] Shine has abandoned any other theories of disparate-impact liability by failing to address them in his summary-judgment opposition. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Bulluck v. Newtek Small Bus. Fin., Inc.*, 808 F. App'x 698, 702 (11th Cir. 2020) (explaining that plaintiffs abandon claims "by failing to raise those arguments in response to [d]efendants' motions for summary judgment").

"significant evidence" supports a finding "that UAB discriminates in how it compensates it[s] African-American employees." (*Id.* at 16). And then, with no record citations, Shine says that the supportive evidence includes:

(1) Shine who possesses multiple degrees related to his job earns about $84,000 per year while whites with high school diplomas earn $184,000 [Christopher Cummings] and $110,000 [Jeff Herrington];

(2) [T]he white person that occupied Shine's position before he was hired made $120,000 annually.

(3) Shine raised the pay disparity issue with the head of the department and immediately began to suffer reprisals from Kathy Litzinger and Laquita Graham;

(4) UAB has nebulous criteria for the receipt of pay raises;

(5) [U]pper management in UAB's IT-Department is bereft of racial diversity;

(6) [S]tatistical evidence shows that African-Americans in UAB's IT-Department receive on average 37% less in annual compensation; and

(7) [S]tatistical evidence shows that African-Americans were less likely to receive promotions.

(*Id.* at 16–17 (footnote omitted)). As detailed below, this circumstantial evidence does not satisfy the *McDonnell-Douglas* framework or the convincing-mosaic framework.

### A.    The *McDonnell-Douglas* framework for pay discrimination

*McDonnell Douglas* is a three-step, burden shifting framework. In Step 1, Shine must establish that: "(1) he belongs to a racial minority; (2) he received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) he was qualified to receive the higher wage." *Hill v. Emory Univ.*, 346 F. App'x 390, 395 (11th Cir. 2009); *see also Smith v. Thomasville*, 753 F. App'x 675, 697 (11th Cir. 2018) ("[A] plaintiff must show that he was paid less than a similarly situated member of a different race and that he was qualified to receive the higher wage."). If Shine meets that burden then, in Step 2, UAB must present "a legitimate and non-discriminatory reason for the employment action." *Edmondson v. Bd. of Trustees of Univ. of Ala.*, 258 F. App'x 250, 252–53 (11th Cir. 2007). If UAB meets its burden, then the burden then shifts back to Shine to show that UAB's proffered reason(s) are merely pretext for discrimination. *Id.* at 253.

The en banc Eleventh Circuit recently clarified that, in Step 1, the plaintiff and any comparator must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1231. That means establishing that the plaintiff and comparator are "sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015)). And, under *Lewis*, a comparator generally will: (1) "have

engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) "have been subject to the same employment policy, guideline, or rule as the plaintiff"; (3) "have been under the jurisdiction of the same supervisor as the plaintiff"; and (4) "share the plaintiff's employment or disciplinary history." *Id.* at 1227–28. In the context of a pay-discrimination claim, the plaintiff and comparator should have similar enough job responsibilities, qualifications, and necessary skillsets to warrant equal compensation.

Shine's prima facie (Step 1) case fails the comparator element because Shine cannot show that "similarly situated comparators outside the protected class received higher compensation." *Hill*, 346 F. App'x at 395. Shine identifies three potential comparators in his brief opposing summary judgment: (1) Christopher Cummings, (2) Jeff Herrington, and (3) "the white person that occupied Shine's position before he was hired." (Doc. 72 at 16). But Shine fails to show that any of these three people are proper comparators.

First, Christopher Cummings is currently the interim "Executive Director of Network Infrastructure in UAB's IT department." (Doc. 66-12 at 1 ¶ 2).[7] Shine conceded that Cummings never worked in the "finance area" of the IT Department, as Shine did. (Doc. 66-1 at 45). And Shine made no effort to explain how Cummings'

---

[7] His name is actually Christian Cummings. (Doc. 66-12).

job duties, responsibilities, and skillsets were sufficiently similar to warrant equal compensation. *See Hill*, 356 F. App'x at 395 (holding that, under the pre-*Lewis* standard, that would-be comparators were not similarly situated because their "jobs involved different responsibilities than [the plaintiff's] job"). In fact, Shine does not even identify what specific positions Cummings has held in the IT Department. Shine's generalized argument that he and Cummings were similarly situated because both worked in the IT Department and Shine was more educated than Cummings does not establish "that they 'cannot reasonably be distinguished.'" *Lewis*, 918 F.3d at 1228. And because Shine made no effort to explain the similarities between Cummings' job and Shine's former job (if any exist), Shine cannot show that they were "similarly situated in all material respects." *See id.* at 1231.

Second, Jeff Herrington "works as the Manager of the Help Desk in the Ask IT department where he manages the day-to-day operations of the service desk where customers seek assistance from IT." (Doc. 66-14 at 4 ¶ 8). As far as the Court can tell, Herrington appears to have held that position since his hiring in 2017. (Docs. 66-10 at 69, 66-14 at 4 ¶ 8). Again, Shine conceded that Herrington never worked in the "finance area" of the IT Department. (Doc. 66-1 at 45). And, again, Shine made no effort to explain how Herrington's job and Shine's job were sufficiently similar to warrant equal compensation. *See Hill*, 346 F. App'x at 395. Shine's argument that

14

they were similarly situated because both worked in the IT Department and Shine was more educated does not establish "that they 'cannot reasonably be distinguished.'" *Lewis*, 918 F.3d at 1228. So, once again, Shine's failure to explain the similarities between Herrington's job and his former job precludes a summary-judgment demonstration that they were "similarly situated in all material respects." *See id.* at 1231.

And third, Shine relies on "the white person that occupied Shine's position before he was hired [who] made $120,000 annually." (Doc. 72 at 16). But Shine's effort to rely on this person suffers from the opposite problem as Cummings and Herrington. Even if the Court assumes that Shine and this person had identical job responsibilities, and that Shine replaced this person (which UAB disputes), the Court still lacks enough information to consider the person a proper comparator. Shine offered nothing about the person's background, experience, tenure at UAB, and other qualifications. Without that information, the Court cannot say that Shine made a summary-judgment showing that this person and Shine are sufficiently similar to warrant equal compensation and that they "cannot reasonably be distinguished." *See Lewis*, 918 F.3d at 1228.

In sum, Shine cannot satisfy the *McDonnell-Douglas* framework because he has not identified a proper comparator in Step 1. *See Hill*, 346 F. App'x at 395.

15

**B.     The convincing-mosaic theory**

In the Eleventh Circuit, a plaintiff can also survive summary judgment by establishing "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Lewis*, 918 F.3d at 1220 n.6. A plaintiff may make this showing with evidence of "(1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification was pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (on remand) (cleaned up).

Shine relies on seven "facts"—without record citations—to support his argument. Facts (1) and (2) relate to UAB's compensation of would-be comparators which, as explained above, does not amount to a summary-judgment showing that "similarly situated comparators outside the protected class received higher compensation." *Hill*, 346 F. App'x at 395. This evidence therefore necessarily fails to show "*systematically* better treatment of similarly situated employees." *See Lewis*, 934 F.3d at 1185 (emphasis added). Fact (3) appears to contend that Shine suffered retaliation. But as explained in the retaliation section of this opinion, *see infra* Section II, Shine's attempt to show that UAB's proffered race-neutral reasons for disciplining him were pretextual falls well short. Facts (4) and (5) are conclusory

16

allegations about UAB's pay and management structures that cannot create a genuine issue of material fact. *See Glasscox*, 903 F.3d at 1213. And in facts (6) and (7), Shine alleges that UAB pays and promotes African-Americans at lower rates than white employees. But the Eleventh Circuit has explained that "a plaintiff does not show . . . disparate treatment discrimination merely by citing statistics." *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1325 (11th Cir. 2006). And as explained in the disparate-impact section of this opinion, *see infra* Section III, Shine's attempt to show a statistically disparate impact falls well short of his burden to connect those alleged disparities to any race-based practice or policy.

Considering all of these facts together, Shine has not presented "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination" in the context of his compensation. *Lewis*, 918 F.3d at 1220 n.6. No evidence shows that Shine's race played a role in UAB's decisions about Shine's compensation. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1345–46 (11th Cir. 2011) (finding sufficient evidence of discrimination where employer injected race into the decision-making process by using a discipline "matrix" that explicitly considered the employee's race). Although Shine presents some statistical evidence that African-American employees generally receive less pay than white employee, this evidence is too abstract to create a genuine dispute of material fact as to Shine's

compensation.[8] And Shine has not shown that his $84,000 salary was lower than any similarly situated white employee. For these reasons, he has not presented evidence that would allow a reasonable jury to infer intentional discrimination.

* * *

Because Shine has no direct evidence of discrimination, and his circumstantial evidence fails both the *McDonnell-Douglas* and convincing mosaic frameworks, the Court will grant summary judgment on Shine's pay-discrimination claim.

## II.   Retaliation

Shine alleged in his third amended complaint that he suffered "retaliation for his reporting and opposing discrimination in employment, which ultimately led to his termination." (Doc. 32 at 8 ¶ 19). And in his summary-judgment opposition, Shine said that UAB terminated him "for raising the issues of racial disparities in promotions and pay with Dr. Carver and other high up officials [during a] May 2018 meeting." (Doc. 72 at 9 ¶ 34). The Court grants summary judgment to UAB on this claim.

---

[8] Shine's expert report says that, between 2014 and 2020, African-American employees in UAB's IT Department earned on average $66,181 while white employees earned on average $90,833, a 37% difference (Doc. 72-1 at 2). But neither the expert nor Shine make any attempt to explain why how this amounts to "systematically better treatment of *similarly situated* employees." *Lewis*, 934 F.3d at 1185 (emphasis added). As a result, this evidence does not bring Shine any closer to a summary-judgment showing of intentional discrimination for his compensation.

Title VII's anti-retaliation provision "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)). And the Court uses the same burden-shifting framework to review Shine's retaliation claim. In Step 1, Shine must "show (1) that [he] engaged in statutorily protected activity, (2) that [he] suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quotation marks omitted). If Shine makes that showing, in Step 2, the burden "shifts to the employer to rebut the presumption [of retaliation] by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* at 1135. If UAB does so, in Step 3, Shine must "demonstrate that the 'proffered reason was merely a pretext to mask [retaliatory] actions.'" *Id.* (alteration in original).

Shine says that he engaged in protected activity when he "complained of racial disparities in promotions and pay at a meeting with Dr. Carver and others in May of 2018." (Doc. 72 at 17). He says that UAB began retaliating against him—with the verbal warning—about two weeks later and that this retaliation ended with his

November 2018 termination. (*Id.* at 17–18). And he argues that the temporal proximity between his "raising the promotion and pay issues" and the verbal warning both satisfies Step 1's causation element *and* Step 3's evidence of pretext. (*Id.*).

UAB counters, among other things, that Shine's claim fails because he cannot show pretext. (Docs. 68 at 23, 79 at 9–10). UAB says that Shine's "own intervening conduct," not his race, led to his discipline and termination. (Doc. 68 at 24).

The Court agrees with UAB. Even if the Court assumes that Shine satisfies his Step 1 burden because his complaints in May 2018 amount to protected activity,[9] UAB's actions constitute adverse-employment actions, and a causal connection exists, Shine's claim still fails in Step 3 because Shine has not made a summary-judgment showing of pretext.

Assuming that Shine made a prima facie case in Step 1, UAB must "articulat[e] a legitimate, non-discriminatory reason for the employment action[s]." *Gogel*, 967 F.3d at 1135. UAB has offered nondiscriminatory reasons for each action it took against Shine:

---

[9] The Court is skeptical that Shine engaged in protected activity. In his summary-judgment opposition, Shine says he "complained of racial disparities." (*See, e.g.*, Doc. 72 at 17). But no evidence supports this assertion. Shine testified that he "raised a concern that some IT employees make more money than others because they have an 'ENT' designation in their job title." (Doc. 66-1 at 67). But he never testified that this disparity had anything to do with race. Indeed, Kendra Thompson testified that she could not "recall race or race-based anything being mentioned in that meeting with Dr. Carver." (Doc. 66-9 at 148). The opposition clause of Title VII protects employees who have "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). But the record does not appear to support a finding that Shine's complaint about ENT designations amounted to an "opposition" of race discrimination in UAB's IT Department. That said, UAB has not adequately briefed this issue, so the Court will not consider it further.

- UAB issued a verbal warning to Shine and placed him on a Performance Improvement Plan because UAB received and confirmed complaints related to Shine's untimely routing and review of contracts. (Doc. 68 at 5–6 ¶¶ 12–14).

- UAB suspended Shine for performance failures because he allowed the Microsoft contract to lapse. (Doc. 68 at 9 ¶ 30).

- UAB terminated Shine for inexcusable neglect of his duties, negligence, and unsatisfactory job performance. (Docs. 68 at 10 ¶ 34, 66-2 at 67–68). And that determination stemmed from the Microsoft contract lapse and Shine's failure to timely route the Gartner contract. (Doc. 66-2 at 67).

These nondiscriminatory reasons satisfy UAB's "exceedingly light" burden. *Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1297 (11th Cir. 2021).

So, in order to survive summary judgment, Shine must "come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by [UAB] were not the real reasons for its action, and that the real reason was retaliation." *Id.* at 1298 (quotation marks omitted). He must rebut UAB's reasons "head on," and he "cannot succeed by simply quarreling with the wisdom of [those] reason[s]." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Shine appears to offer three arguments to support pretext. First, Shine says that the "close temporal proximity between the protected action and the adverse employment action can be evidence of pretext." (Doc. 72 at 18). But the en banc Eleventh Circuit recently said that "[w]hile close temporal proximity between the

protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Gogel*, 967 F.3d at 1137 n.15. So, at minimum, Shine must show more.[10]

Second, Shine says that he was "accused of phantom performance issues." (Doc. 72 at 18). But Shine himself acknowledged the complaints "about the process of everything, how the flow of contracts go," and he conceded that "[t]hey didn't like the flow of contracts because they were taking too long." (Doc. 66-1 at 102). He also acknowledged that the 2018 Microsoft Premier contract lapsed. (*Id.* at 132). These concessions align with UAB's reasons for his discipline and termination. (Docs. 66-2 at 35 (verbal warning), *id.* at 67 (termination)). And, again, the record does not support a finding that UAB fabricated complaints against Shine. *See ante* at 3 n.3. In sum, Shine's conclusory allegations about fabrication—coupled with his concessions about events that underlie his discipline and termination—bring him no closer to pretext.

Moreover, "[w]hen an employer asserts that it has fired an employee based on reported workplace incidents, the employee must not only dispute that those

---

[10] Shine does not explain how a close temporal proximity between his May 2018 conduct and his May 2018 warning (and PIP placement) translates into a retaliatory firing in November 2018. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that a three-month gap was not close enough for causation).

incidents occurred, but also call into question the employer's sincere belief that they occurred." *Lewis v. Blue Bird Corp.*, 835 F. App'x 526, 530 (11th Cir. 2020). Shine has not genuinely disputed the existed of his own performance issues. And neither has he disputed UAB's good-faith belief that Shine's job performance was unsatisfactory. So this reinforces the conclusion that Shine cannot show pretext.

Third, Shine points out that he completed the Performance Improvement Plan in summer 2018 but was "still pegged for termination." (Doc. 72 at 18). As the Eleventh Circuit has explained for causation, "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011). Likewise for pretext, intervening performance deficiencies can serve as independent support for discipline or termination. Thus, the fact that Shine completed his PIP is not evidence of pretext where several intervening performance issues independently supported his termination and there is no other indication that his performance issues weren't the reasons for his discipline and termination.

In sum, UAB offered nondiscriminatory performance-based reasons for its employment actions, and Shine has not shown "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in UAB's reasons that would allow a reasonable factfinder to say that they are "unworthy of credence." *Springer v.*

*Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2008). Nor has Shine presented evidence that would allow a reasonable juror to find that UAB instead fired Shine as retaliation for speaking out about racial pay disparities. So the Court will grant summary judgment on Shine's retaliation claim.

## III.   Disparate Impact

Shine's final claim is disparate-impact discrimination. "[D]isparate impact theory prohibits *neutral* employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000). For the reasons below, the Court grants summary judgment to UAB on this claim.

Disparate impact claims also use the three-step burden-shifting framework. To establish a prima facie disparate-impact case in Step 1, Shine must satisfy three elements. *Id.* First, he must show "a significant statistical disparity." *Id.* Second, he must show "a specific, facially[]neutral, employment practice which is the alleged cause of the disparity." *Id.* Then third, "and most critically," he must show "that a causal nexus exists between the specific employment practice identified and the statistical disparity shown." *Id.*

If Shine makes a prima facie case, then the burden "shifts to the defendant to establish that the challenged employment practice serves a legitimate, non-

discriminatory business objective." *Id.* at 1275. And UAB does this, then in the final step, Shine must show "that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." *Id.*

Shine's disparate-impact claim fails for two reasons. First, he abandoned his original disparate-impact theory and impermissibly raised (and now exclusively relies on) a new theory in his summary-judgment opposition. And second, the newly raised disparate-impact theory fails on the merits.

**A.    Shine cannot raise a new theory at summary judgment.**

Shine presented one disparate-impact theory in his pleadings and a different theory in his summary-judgment opposition. By doing so, Shine abandoned his original theory and impermissibly tries to rely on a theory that he did not plead in his complaint. *See Resolution Trust Corp.*, 43 F.3d at 599 ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Cacciamani v. Target Corp.*, 622 F. App'x 800, 804–05 (11th Cir. 2015) (explaining that a party cannot rely on a theory that "had not been properly pled").

In the third amended complaint, Shine alleged that UAB "undertook a policy of denying African-Americans in its [IT] Department the same opportunities for better jobs and higher pay" that it offered white employees. (Doc. 32 at 9 ¶ 21). He alleged that "UAB accomplished this aim by employing a 'Performance Evaluation'

metric that had the effect of making African-Americans appear less deserving of better jobs and higher pay." (*Id.* at 9 ¶ 22). The effect, according to Shine's complaint, was that "[w]hite employees with little seniority or experience were brought into UAB and then promoted into positions of higher authority and pay." (*Id.*). And Shine alleged that "[t]hese processes disparately impacted African-American employees such as Shine . . . because they allow subjectivity and racism to unlawfully influence employment decisions." (*Id.* at 24 ¶ 80).

Shine changed course in his brief opposing summary judgment. He never mentioned the "Performance Evaluation" theory. Instead, Shine now says that "UAB's Promotion by Reclassification Policy . . . violates Title VII's disparate-impact prohibition." (Doc. 72 at 18). According to Shine's new theory, the Promotion by Reclassification Policy "allows for promotion of employees without the jobs being posted for open-bid on its careers website." (*Id.* at 12 ¶ 3). And he says that the policy "allows UAB to circumvent its regular job posting procedure and award higher pay to incumbent employees by changing the job title for the position which entails a raise in pay." (*Id.* at 13 ¶ 6). And he argues that the policy allows UAB "to skirt proper promotion procedures to benefit one group over the other," and leads to "white employees with high school diplomas earn[ing] six figure salaries, while African-Americans are implicitly told to be happy with receiving high

five figures." (*Id.* at 19).

Shine abandoned the original "Performance Evaluation" theory by failing to raise supportive arguments in response to UAB's motion for summary judgment. *Resolution Trust Corp.*, 43 F.3d at 599. And he cannot rely on the "Promotion by Reclassification" theory because he raised it for the first time at the summary-judgment stage. *Cacciamani*, 622 F. App'x at 804–05. After all, any plaintiff's complaint "must give the defendant notice of what the plaintiff complains." *Id.* at 804. And "[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Id.* (second alteration in original). As a result, Shine impermissibly injected the Promotion by Reclassification theory into this case. He cannot rely on it to survive summary judgment.

The Court may grant summary judgment to UAB on Shine's disparate-impact claim for these reasons alone. Still, the Court will address Shine's new theory.

**B.     Shine's new theory fails on the merits.**

Shine's new theory cannot survive summary judgment on the merits, either. Shine produced an expert report that says, between 2014 and 2020, African-American employees in UAB's IT Department averaged $66,181 per year while white employees averaged $90,833—a 37% difference. (Doc. 72-1 at 2). The report also says that African-American employees receive promotions at a lower frequency

than white employees—14.58% for African-American employees and 21.14% for white employees. (*Id.* at 3). Shine says in his summary-judgment opposition that the Promotion by Reclassification Policy is the cause of these disparities. (Doc. 72 at 18–19).

After careful review, the Court finds that Shine has failed to satisfy the causation element of his disparate-impact case because he cannot show "a causal nexus . . . between the specific employment practice identified and the statistical disparity shown." *Joe's Stone Crab, Inc.*, 220 F.3d at 1274. The Eleventh Circuit has made clear that "a plaintiff does not show . . . disparate impact racial discrimination . . . merely by citing statistics." *Burke-Fowler*, 447 F.3d at 1325. And Shine does no more than just cite surface-level statistics about promotions in the IT Department generally, so he has not connected (and cannot connect) the cited disparities with the policy. No evidence suggests that UAB used *this policy* to promote white employees at higher rates than African-American employees. And without something to connect this policy to the pay and promotion imbalances, Shine cannot establish causation. For that reason, Shine's disparate-impact claim fails on the merits (on top of being precluded because Shine failed to plead it in his complaint).

## CONCLUSION

For these reasons, the Court **DENIES AS MOOT** UAB's motion to strike (doc. 76) and will enter a separate order that **GRANTS** UAB's motion for summary judgment on Shine's claims (doc. 63).

**DONE** on **December 30, 2021**.

_____

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE