FILED
2021 Dec-30  PM 01:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **MICHAEL SHINE, TONY ELLIS, and LEWIS THOMAS,** ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **Case No. 2:18-CV-2093-CLM** |
| **THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA,** ) ) ) ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Tony Ellis sued his former employer, The Board of Trustees of the University of Alabama ("UAB"), alleging race discrimination and hostile work environment under Title VII, 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981. UAB has moved for summary judgment (doc. 64) and to strike Ellis's expert designation and report (doc. 76). For the reasons below, the Court **GRANTS** the motion for summary judgment and **DENIES AS MOOT** the motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court draws the facts from the summary-judgment record. At this stage, "[a]ll evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021).

## I.    Factual Background[1]

Tony Ellis, an African-American man, began working for UAB in October 2007 as an AV Technician.[2] (Docs. 69 at 3 ¶ 1, 73 at 1 ¶ 1). In that role, he provided computer and tech support for UAB's classrooms. (Docs. 69 at 4 ¶ 5, 73 at 2 ¶ 5). Ellis worked the day shift, from 7:00 a.m. to 3:30 p.m. (Docs. 69 at 5 ¶ 9, 73 at 2 ¶ 9). Another AV Technician, Trent Hamilton, worked the night shift. (*Id.*). At the beginning, Ellis reported to AV Manager Walt Creel (a white man) and Director of IT Client Services Jamie Witter (a white woman). (Docs. 69 at 4 ¶ 6, 73 at 2 ¶ 6). In his deposition, Ellis detailed various forms of alleged mistreatment by UAB.

---

[1] For many facts, Ellis argues that the Court should disregard the testimony of UAB's employees because they are "interested witnesses." (*See, e.g.*, Doc. 73 at 3 ¶ 12). But repeating this contention (eleven times) does not dispute the facts asserted by UAB's witnesses. And the Court will not ignore their uncontroverted testimonies at the summary-judgment stage. *See, e.g.*, *Woods v. Delta Air Lines Inc.*, 595 F. App'x 874, 879 (11th Cir. 2014) ("[U]nder Rule 56, a party may support a motion for summary judgment with, among other things, affidavits or declarations, and there is no requirement that these sworn statements be from disinterested witnesses. Once the moving party does so, the nonmoving party bears the burden to produce evidence to dispute the facts averred in the sworn statement." (citations omitted)); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898 (5th Cir. 2002) ("The definition of an interested witness cannot be so broad as to require us to disregard testimony from a company's agents regarding the company's reasons for discharging an employee.").

[2] Ellis has a bachelor's degree in broadcast journalism from Rust College. (Doc. 66-3 at 15–16).

### A.    Mistreatment during Ellis's tenure as an AV Technician

First, Ellis claims that his superiors, Creel and Witter, treated him unfairly through their negative feedback about his performance. (Doc. 66-3 at 131). He gave two examples. First, he said that they "tried to question . . . the accuracy and the perfection that I exude on my job." (*Id.*). Second, he said that Creel and Witter told "everybody" during a meeting that they needed to prioritize putting detailed information on their work tickets after completing assignments. (*Id.* at 131–33).

Ellis also says that his superiors treated Trent Hamilton—his night-shift counterpart—more favorably than him. Ellis testified that Hamilton left work orders open that Ellis had to resolve (*id.* at 170–71), disregarded UAB's policy to keep a work-monitoring application open on his computer (*id.* at 189–90), left work early (*id.* at 200–03), and did not clock out for lunch breaks (*id.* at 205–07).[3] Yet, Ellis says, UAB still recognized Hamilton for his good performance. (Docs. 69 at 5 ¶ 10, 73 at 2–3 ¶ 10). But Ellis says that he received no recognition despite his own "excellent" performance. (Doc. 66-3 at 199). Ellis did, however, earn more money than Hamilton for the entire time they worked together. (Doc. 66-13 at 2–3 ¶ 3).

---

[3] Ellis also testified that his superiors did not make Hamilton present a doctor's excuse after missing work as he had to do. (*Id.* at 192–93).

**B.     Ellis's job transitions and pay raises**

Ellis served as an AV Technician until 2015. (Docs. 69 at 6 ¶ 15, 73 at 4 ¶ 15). UAB then reclassified Ellis as a Computer Support Technician—Enterprise. (*Id.*). Then, in March 2017, Ellis laterally transferred to the "Academic Technology/Classroom Support department," based on available funding and business needs. (Docs. 69 at 6 ¶ 16, 73 at 5 ¶ 16; *see also* Doc. 66-14 at 5 ¶ 12).

In late 2017, UAB increased Ellis's pay from $18.04 per hour to $21.20 per hour. (Docs. 69 at 6 ¶ 17, 73 at 4 ¶ 17). UAB informed Ellis of the raise in a letter thanking him for his service to the IT Department and for his "significant and continued contributions" to the IT Department's work. (Doc. 66-4 at 63). The record shows that this raise supplemented Ellis's annual raises. (Doc. 66-3 at 241).

**C.     Ellis files an internal complaint early 2017**

In January 2017, Ellis sent UAB a letter detailing his mistreatment. He reported that he faced "racial jokes, name calling, weapon possession, insults, put-downs, threats, trash, and body fragments left in [his] personal space by co-workers and/or supervisor(s)." (Doc. 64-4 at 64). He also said that his supervisors often displayed preferential treatment for other employees. (*Id.* at 64–65).

As for the racial jokes, Ellis said that Earl Reagan (a fellow Customer Support Technician who resigned in 2015) made jokes about chickens and watermelon.

(Docs. 69 at 7–8 ¶ 21, 73 at 5 ¶ 21). And he said that Reagan and Fred Hogg (another Customer Support Technician who resigned in 2016) called him "boy." (*Id.*; *see also* Doc. 66-3 at 161–62).

As for the weapon incident, Ellis said that (at some point between 2015 and 2017) Reagan lifted his shirt in front of Ellis to display a pistol. (Docs. 69 at 8 ¶ 22, 73 at 5 ¶ 22). Ellis conceded that Reagan did not point the weapon at him. (*Id.*). And Ellis could not recall whether Reagan made any threatening verbal remarks. (Doc. 66-3 at 167). But Ellis said that he considered the act threatening. (*Id.* at 168).

And as for the "body fragments," Ellis testified that Reagan left dirty nose-blown tissues in his work area. (Docs. 66-3 at 169, 69 at 8 ¶ 23, 73 at 5 ¶ 23). But he also testified that Reagan apologized for the incident. (Doc. 66-3 at 170).

### D.   Ellis's 2017 written warning

Creel issued a written warning to Ellis in November 2017 for failing to make travel arrangements to attend training. (Docs. 69 at 8 ¶ 25, 73 at 5 ¶ 25; *see also* Doc. 66-4 at 13 (warning)). Ellis says that he should not have received the warning and that Creel should have handled Ellis's travel arrangements. (Docs. 69 at 8 ¶ 26, 73 at 5 ¶ 26). He also claims that this discipline was unfair because Creel made travel arrangements for Hamilton but not for him. (Doc. 66-3 at 74–77).

### E.    Allegations of Discrimination

Along with the alleged mistreatment detailed above, Ellis testified about several other instances of discriminatory treatment.

#### 1.    Promotions

Ellis testified that UAB discriminated against him in the context of promotions. He said that his superiors—including Creel, Witter, and Kathy Litzinger (a white woman who was the Executive Director of IT Business Operations)— discriminated against him by discouraging him from applying for promotions, telling him he was unqualified for certain jobs, or telling him some jobs didn't pay as much as he was already earning. (Doc. 69 at 9 ¶ 28, 73 at 6 ¶ 28). Ellis testified that he "constantly would ask about upward mobility" in the IT Department. (Doc. 66-3 at 51). But he never formally applied for any positions in the IT Department. (Docs. 69 at 10 ¶ 31, 73 at 10 ¶ 31). He said that he didn't apply because his superiors "discouraged" him from applying. (Doc. 73 at 7 ¶ 31).

#### 2.    Training

Ellis also claims that UAB discriminated against him by denying him opportunities to participate in training. He testified that other employees, like Hamilton and Reagan, automatically received training that he had to take initiative to receive. (Docs. 69 at 10 ¶ 35, 73 at 8 ¶ 35).

### 3.    Pay and Performance

Ellis testified that UAB paid white employees Austin Anderson, Ben Ball, and Hamilton more than it paid him. (Docs. 69 at 11 ¶ 40, 73 at 9 ¶ 40). Without explaining more, Ellis said that he has been "able to confirm that Anderson, Ball, and Hamilton all received higher compensation via UAB's Expenditure website." (Doc. 73 at 9 ¶ 40).

### F.    Allegations of Retaliation

Ellis says UAB began to retaliate against him after he sent his January 2017 letter complaining about his discriminatory mistreatment. (Docs. 66-3 at 245–47, 69 at 12 ¶ 46, 73 at 12 ¶ 46). He testified that his performance evaluations progressively reflected worse performance. (*Id.*). Ellis could not recall any details other than that his evaluations were "inaccurate." (Doc. 66-3 at 251). The record does show one instance in which Ellis complained about his rating of "Solid" and said that his rating "should have at least been Strong." (Doc. 66-4 at 70). Kendra Thompson, a Personnel Generalist at UAB, explained in her declaration that "[f]rom 2016 to 2019, Tony earned a Solid Performer Rating, a rating reflecting that the employee meets expectations." (Doc. 66-14 at 5 ¶ 12).

### G.    Allegations about Creel and Jeff Herrington

According to Ellis, on an occasion when he had a cold and sneezed in Creel's

direction, Creel told Ellis that he would "kill" Ellis if he sneezed again. (Docs. 69 at 13 ¶ 50, 73 at 13 ¶ 50; *see also* Doc. 66-3 at 153, 221–24). Ellis reported the remark to UAB and several police departments. (Docs. 69 at 13 ¶ 51, 73 at 13 ¶ 51).

UAB promptly removed Creel from his supervisory position over Ellis (docs. 69 at 13 ¶ 52, 73 at 13 ¶ 52), and allowed Ellis to take paid leave while it investigated the incident (doc. 66-13 at 4 ¶ 6). UAB officials searched Creel's person and workspace but found no weapons. (*Id.*).

Jeff Herrington took over for Creel. (Docs. 69 at 14 ¶ 54, 73 at 13 ¶ 54). Ellis testified that Herrington once displayed a Confederate flag emblem on the background of his computer screen during a virtual meeting. (*Id.*). As UAB explained, Herrington displayed a screen shot of the movie *Full Metal Jacket* which contained a character whose helmet had a small Confederate flag emblem on his helmet. (Docs. 69 at 14 ¶ 56; *see also* Doc. 66-13 at 4 ¶ 7).[4] UAB also explained that it "counseled [Herrington] not to display such movie scenes in the future." (Doc. 66-13 at 4).

---

[4] UAB also said that Herrington displayed the *Full Metal Jacket* screenshot because "Herrington and the employees on his team had discussed the hair cut of one of the movie characters and that was his reason for displaying the movie scene." (Doc. 69 at 14 ¶ 57). In his summary-judgment opposition, Ellis did not dispute Herrington's apparent reason for displaying the screenshot. He did, though, says that the movie "premiered in 1987, so it should not have been news to Herrington or anyone else." (Doc. 73 at 14 ¶ 58).

Ellis also testified that, during the meeting, Herrington made comments about violence and shootings in Birmingham. (Docs. 69 at 14 ¶ 54, 73 at 13 ¶ 54). Ellis said he that believed Herrington directed those comments at him. (Doc. 66-3 at 217).

### H.    Ellis's current employment

As of this year, Ellis works as a Supplier Diversity Specialist in the Facilities Department of UAB. (Doc. 69 at 4 ¶ 3, 73 at 2 ¶ 3). He obtained this job after applying for "about five jobs" outside the IT Department. (Doc. 66-3 at 96). And he testified that he "loves" his current position. (*Id.* at 240).

## II.    Procedural Background

Ellis filed three charges with the Equal Employment Opportunity Commission. (Docs. 69 at 15 ¶¶ 59–61, 73 at 14 ¶¶ 59–61). He filed those charges in July 2017, March 2019, and May 2020. (Doc. 66-13 at 9–16). And the EEOC issued notices of Ellis's right to sue in February 2018, August 2019, and September 2020, respectively. (*Id.*).[5]

---

[5] UAB raised valid questions about the timeliness of Ellis's participation in this federal action. (Doc. 69 at 16–17). First, Ellis did not file a lawsuit within 90 days of receiving his first right-to-sue letter as required by 42 U.S.C. § 2000e-5(f)(1). *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989); *Brown v. Unified Sch. Dist.*, 465 F.3d 1184, 1186 (10th Cir. 2006) ("If the claimant fails to file suit within the ninety-day window, the lapsed claims are not revived by including them in a second EEOC charge and restarting the process."). Second, although Ellis may "piggyback" onto co-plaintiff Michael Shine's timely filed lawsuit, he can only rely on alleged discriminatory treatment within 180 days of Shine's May 2018 charge. *Stone v. First Union Corp.*, 371 F.3d 1305, 1310–11 (11th Cir. 2004); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1220 (11th Cir. 2001). And, as UAB explains, Ellis appears to rely on several allegations that fall outside the temporal scope of Shine's May 2018 charge. For this opinion, the Court will assume (without deciding) that Ellis's lawsuit and all of his allegations are timely.

Co-plaintiff Michael Shine filed this lawsuit against UAB and Kathy Litzinger in December 2018. (Doc. 1). Ellis became a plaintiff in the second amended complaint, filed in April 2019. (Docs. 18-1, 19). The third amended complaint—the operative complaint—raises three claims. First, a Title VII disparate-treatment claim against UAB for race discrimination "with regards to promotions, pay[,] and other terms and conditions of employment." (Doc. 32 at 20). Second, a claim for race discrimination and retaliation under the Equal Protection Clause and 42 U.S.C. § 1983. (*Id.* at 21). And third, a Title VII disparate-impact claim against UAB. (*Id.* at 23). Ellis also appears to raise identical claims against UAB under 42 U.S.C. § 1981. (*Id.* at 2).[6] The Court has dismissed all claims against Litzinger. (Docs. 47, 62). So all that remains are the claims against UAB.

UAB filed a motion for summary judgment on Ellis's claims. (Docs. 64, 69, 78). Ellis opposes summary judgment. (Doc. 73). To support his opposition, Ellis produced an expert report with statistical evidence about pay and promotion in UAB's IT Department between 2014 and 2020. (Doc. 73-1). And UAB has moved to strike the expert report. (Doc. 76).

---

[6] Section 1981 does not provide for suits against state actors. *Bryant v. Jones*, 575 F.3d 1281, 1287 n.1 (11th Cir. 2009). The Court therefore dismisses Ellis's Section 1981 claims against UAB for lack of jurisdiction.

## STANDARD OF REVIEW

The Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material if its resolution "might affect the outcome of the suit." *Id.* To survive a "properly supported motion for summary judgment, [the nonmovant] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018).

## DISCUSSION

The Court divides its discussion into three parts. First, the Court addresses Ellis's claims for discrimination in promotions, pay, and training (his disparate-treatment theories). Second, hostile work environment. And third, disparate-impact discrimination.[7]

---

[7] Ellis has abandoned any other theory of liability by failing to address them in opposition to UAB's well-supported motion for summary judgment. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

## I.     Disparate Treatment: Discrimination in Promotions and Pay

For any Title VII disparate-impact claim, the plaintiff "has the burden of persuading the trier of fact that the defendant has committed intentional discrimination." *Lincoln v. Bd. of Regents of Univ. Sys. of Ga.*, 697 F.2d 928, 936 (11th Cir. 1983). The plaintiff "can do so in a variety of ways, one of which is by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc). Other ways to satisfy this burden are to "present direct evidence of discriminatory intent, or demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1220 n.6 (citations omitted).

In his brief in opposition, Ellis appears to assert that UAB intentionally discriminated against him in three ways. First, he says that UAB discriminated against him in promotions by discouraging him from applying for higher-paying jobs. (Doc. 73 at 19). Second, he says that UAB discriminated against him in the context of his pay. (*Id.*). And third, he mentions in one sentence of his fact section that UAB discriminated against him "with regard to training." (*Id.* at 6 ¶ 27). The Court addresses each in turn.

### A.   Discrimination in Promotions

Ellis contends that UAB racially discriminated against him "by discouraging him from applying for jobs of higher pay[]." This is a failure-to-promote claim. The Court grants summary judgment to UAB on this claim because Ellis cannot satisfy either the *McDonnell-Douglas* framework or the convincing mosaic framework.

*McDonnell-Douglas* creates a three-step burden shifting framework. In Step 1, the plaintiff must establish that: (1) "he or she belonged to a protected class"; (2) "he or she was qualified for and applied for a position that the employer was seeking to fill"; (3) "despite qualifications, he or she was rejected"; and (4) "the position was filled with an individual outside the protected class." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005). If the plaintiff makes that showing, the burden shifts to the employer "to produce a legitimate, non-discriminatory reason for the alleged disparate treatment" in Step 2. *Hill v. Suntrust Bank*, 720 F. App'x 602, 605 (11th Cir. 2018). If the employer does so, then the burden shifts back to the plaintiff (Step 3) to "show that the employer's proffered reasons are merely pretextual." *Id.*

Ellis bases his promotion-discrimination claim on his allegation that he "repeatedly ask[ed] to be considered for jobs only to be told over and over he was not qualified." (Doc. 73 at 20). Elsewhere in his summary-judgment opposition (in

support of his disparate-impact claim), Ellis contends that UAB often uses a "Promotion by Reclassification Policy," which "allows for promotion of employees without the jobs being posted for open-bid on its careers website." (*Id.* at 15 ¶ 3). And he says that the policy "allows UAB to circumvent its regular job posting procedure and award higher pay to incumbent employees by changing the job title for the position which entails a raise in pay." (*Id.* at 16 ¶ 6). But Ellis does not allege or show that UAB used this policy to hire someone else for a position Ellis coveted. And UAB contends that Ellis's claim fails because "he admittedly never applied for a promotion" and did not "demonstrate any exception relaxing the application requirement." (Doc. 69 at 18; *see* Docs. 69 at 10 ¶ 31, 73 at 7 ¶ 31).

In Step 1, Ellis must show (among other things) that "he or she was qualified for and applied for a position that the employer was seeking to fill." *Vessels*, 408 F.3d at 768. "[T]here are certain exceptions that allow a plaintiff to establish a prima facie case even if she did not apply for the position at issue." *Williams v. VWR Int'l, LLC*, 685 F. App'x 885, 887 (11th Cir. 2017) (collecting binding decisions). After careful review, the Court finds that none apply here.

1. The first exception to the application requirement "is the 'informal process' exception, where a plaintiff need not show that she applied for the job if she can show that the employer 'd[id] not formally announce [the] position, but rather use[d]

informal and subjective procedures to identify a candidate." *Id.* (quoting *Vessels*, 408 F.3d at 768) (cleaned up)). Still, under this exception, the plaintiff must "show that the employer had some reason to consider her for the position." *Id.*

This exception does not apply here. Ellis has not shown that UAB followed an informal hiring process—such as the Promotion by Reclassification Policy—to deny him any specific promotion or position. There is no summary-judgment evidence to demonstrate that UAB failed to follow its usual online-job-posting procedures for positions that Ellis desired. (*See* Doc. 66-3 at 109 (Ellis conceding in his deposition that the usual application process entails going on UAB's website, finding a job posting, and applying for it)). Nor does UAB's use of an interview panel amount to an "informal and subjective" procedure that would get Ellis over his hurdle. *Williams*, 685 F. App'x at 887. As a result, the exception does not apply here to forgive Ellis's failure to apply for any specific jobs.

2. The second "exception is the 'futile gesture' exception, where a plaintiff need not show that she applied for the job if she had a 'justifiable belief that the employer's discriminatory practices made application a futile gesture.'" *Id.* at 887–88 (quoting *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1274 (11th Cir. 2002)). To trigger this exception, the plaintiff must show: "(1) that she had a real and present interest in the job for which the employer was seeking applications; and

(2) that she would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices." *Id.* at 888 (quoting *Joe's Stone Crabs*, 296 F.3d at 1274). An "inquiry into the hiring process" is enough for "a real and present interest in the job." *Id.* But "[t]he Supreme Court has described the types of discriminatory practices that render an application futile as 'the most entrenched forms of discrimination.'" *Id.* (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367 (1977)). The rationale for the exception is that, without it, "[v]ictims of gross and pervasive discrimination could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups." *Int'l Bhd. of Teamsters*, 431 U.S. at 367.

This exception does not apply, either. True, the evidence is probably sufficient to support a finding that Ellis expressed "a real and present interest" in some jobs for which UAB was accepting applications. For example, Ellis testified that he "asked about several positions and . . . they told me that I didn't qualify." (Doc. 66-3 at 35). And he also testified that constantly asked about "upward mobility" in UAB's IT Department. (*Id.* at 51). But Ellis has not presented enough specific evidence to support that UAB "deterred" Ellis from applying through "discriminatory practices." *See Williams*, 685 F. App'x at 888.

The benchmark for the kind of deterrence that triggers this exception is a

"most entrenched form[] of discrimination." *Williams*, 685 F. App'x at 888 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 367). But Ellis has not met that hurdle. He testified that his superiors discouraged him from applying by telling him that he wasn't qualified for some positions. (*See, e.g.*, Doc. 66-3 at 39, 35, 125, 154). He said that a superior told him that "there's not much out there" and that he will "just have to watch the [job-posting] board." (*Id.* at 124). And he said that one superior told him that some positions didn't pay "much more than [he] was already making." (*Id.*). But he could not recall ever asking his superiors why they believed he was not qualified. (*Id.* at 40, 126, 128). And he never testified that any superior told him not to apply or that he could not apply for any specific job. (*See, e.g.*, *Id.* at 101, 125).

Ellis's testimony cannot support a finding that his superiors' engaged in a "discriminatory practice" to deter him from applying. *Williams*, 685 F. App'x at 888. And he necessarily fails to show a "most entrenched form[] of discrimination." *Williams*, 685 F. App'x at 888 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 367). For one, no evidence suggests that his superiors' statements—about his qualifications and the availability of jobs—were factually untrue for any specific position. For another, no evidence suggests that any of his superiors' allegedly discouraging remarks had anything to do with Ellis's race. Nor is there any evidence that any other African-American employee in UAB's IT Department suffered from

the same treatment. Without that evidence, Ellis cannot show that UAB "had a policy of discrimination that was so pervasive that her application would have been a futile gesture." *Williams*, 685 F. App'x at 889.[8]

Ellis makes no effort in his brief in opposition to connect his superiors' allegedly discouraging remarks to his race. Instead, he merely says that his superiors discouraged him. (Doc. 73 at 19). But without evidence that this was through a racially discriminatory practice, the futile-gesture exception cannot apply. *See Williams*, 685 F. App'x at 887–88 (explaining that the plaintiff must "have a justifiable belief that the employer's *discriminatory practices* made application a futile gesture" (emphasis added)). Thus, the exception does not apply here.

Ellis has not shown that the application requirement does not apply in this case. *See Vessels*, 408 F.3d at 768 (explaining that the plaintiff must show that he "was qualified for and applied for a position that the employer was seeking to fill"). His other arguments—that he trained employees who were "unfairly" promoted over him (Docs. 69 at 10–11 ¶ 36, 73 at 8 ¶ 36) and that some of his white co-workers were promoted over him (Docs. 69 at 10 ¶ 32, 73 at 7 ¶ 32)—are irrelevant because

---

[8] The Eleventh Circuit's decision in *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265 (11th Cir. 2002), is illustrative. There, the Court excused plaintiffs' failures to apply because the presented evidence that the defendant–restaurant rejected food-server applications from women. *Id.* at 1265–76. Here, by contrast, Ellis has put forth no evidence that UAB had a pervasive and systemic policy of excluding African-Americans from promotions through a discriminatory hiring practice.

Ellis never applied for a promotion. For that reason, Ellis cannot make a prima facie case of promotion-discrimination in *McDonnell-Douglas*'s first step.

Nor has Ellis presented "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination" for his promotion-discrimination claim. *Lewis*, 918 F.3d at 1220 n.6 (citations omitted). Without evidence that his superiors discouraged him *because of his race*, no reasonable juror could find that UAB intentionally discriminated against Ellis.

For these reasons, the Court grants summary judgment to UAB on Ellis's promotion-discrimination claim.

## B.    Discrimination in Pay

Ellis raised a pay-discrimination claim against UAB. (Doc. 32 at 20). In his brief in opposition, Ellis frames his pay-discrimination claim like this: "Ellis has presented significant evidence that UAB discriminated against him in promotions and pay by discouraging him from applying for jobs of higher pay[.]" (Doc. 73 at 19). Ellis abandoned any other bases by failing to raise them in his briefing. *See Resolution Trust Corp.*, 43 F.3d at 599.

This claim is indistinguishable from Ellis's promotion-discrimination claim. And Ellis effectively conceded as much during his deposition: "Well, my pay is pretty much – my pay and a promotion goes hand in hand. So if I'm trying to be

promoted, that means – well, if I get promoted, that means my pay goes up." (Doc. 66-3 at 155). So Ellis's basis for pay discrimination is not that he should have earned more in the positions he held. Rather, Ellis says that he should have been promoted and would have earned more money in those positions. Such a claim fails for the same reasons that his promotion-discrimination claim failed.

To be sure, Ellis makes no summary-judgment attempt to show that similarly situated comparators received higher compensation. *See Smith v. Thomasville*, 753 F. App'x 675, 697 (11th Cir. 2018). He therefore cannot satisfy the first step of the *McDonnell-Douglas* framework. Nor has Ellis presented "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination" in terms of his pay. *Lewis*, 918 F.3d at 1220 n.6 (citations omitted). There is no basis for a pay-discrimination claim to survive summary judgment. So the Court grants summary judgment to UAB on this claim.

## C.   Discrimination in training

Assuming Shine raised a claim for discrimination based on UAB's discriminatory failure to train him, the Court grants summary judgment to UAB.

In one sentence in the fact section of his brief in opposition, Ellis wrote that he "alleges that he was discriminated against with regard to training." (Doc. 73 at 6 ¶ 27). Ellis cited a portion of his deposition where he alleged that UAB trained white

employees and supplied them with answers to certification tests to "prepare white employees for upward mobility." (Doc. 66-3 at 53–55, *id.* at 59–60).

For a general disparate-impact claim to survive summary judgment, the plaintiff must either satisfy the *McDonnell-Douglas* framework or some other recognized method of making a summary-judgment showing of intentional discrimination. *Lewis*, 918 F.3d at 1217, 1220 n.6. To satisfy the first step of *McDonnell Douglas*, Ellis must show that he "(1) was a member of a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) similarly-situated employees outside of the protected class were treated differently." *Hester v. Univ. of Ala. Birmingham Hosp.*, 798 F. App'x 453, 456 (11th Cir. 2020). Ellis could also survive summary judgment by establishing "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Lewis*, 918 F.3d at 1220 n.6.

Ellis devoted no effort in the argument section of his brief to explain how UAB's failure to train him constitutes intentional discrimination. He never mentions the word "train" outside the single sentence in his fact section. UAB argued in its initial brief that Ellis's other allegations of race discrimination do not amount to adverse employment actions and should not get him past summary judgment. (Doc. 69 at 20–22). Ellis argued nothing in response.

The Eleventh Circuit has made clear "that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004). The burden "is upon the parties to formulate arguments." *Resolution Trust Corp.*, 43 F.3d at 599. Because Ellis has not formulated legal arguments showing that his purported training-discrimination claim should survive summary judgment, the Court finds that Ellis has abandoned it.

Thus, the Court grants summary judgment to UAB on this claim.

## II.    Hostile Work Environment

To prove a hostile work environment claim, Ellis must show that his "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248 (11th Cir. 2014). And to survive summary judgment, Ellis must establish:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability.

22

*Id.* at 1248–49. To satisfy the "severe or pervasive" harassment element, Ellis must establish that his work environment was both subjectively and objectively hostile. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). For the objective-hostility component, the Court considers four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* These factors guide the inquiry but are "not subject to mathematical precision." *Bryant*, 575 F.3d at 1297. Rather, the Court views the evidence "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc).

UAB contends that Ellis cannot make a summary-judgment showing of a hostile work environment because Ellis cannot show that his alleged harassment was "severe or pervasive" enough to support a claim. (Doc. 69 at 24-25). UAB also says that its remedial actions against Ellis's alleged harassers precludes liability. (*Id.* at 25–26). The Court agrees with UAB that Ellis has not (and cannot) make a summary judgment showing that his "harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive

working environment." *See Adams*, 754 F.3d at 1249. And the Court grants summary judgment to UAB on that basis.

### A.    Ellis's sole argument fails to establish objective hostility

In his brief in opposition, Ellis relies exclusively on a single incident of alleged harassment to support his hostile work environment claim—*i.e.*, his white co-worker, Earl Reagan, lifting his shirt to show Ellis a pistol. (Doc. 73 at 22–24). Although the Court views the evidence "cumulatively and in the totality of the circumstances," *Reeves*, 594 F.3d at 808, it is equally true that "the onus is upon the parties to formulate arguments" that support its legal positions. *Resolution Trust Corp.*, 43 F.3d at 599. Ellis has therefore abandoned other factual bases to support his hostile work environment claim by failing to explain how other facts support his claim. *See id.*

As for the weapon incident, Ellis testified that his co-worker Earl Reagan brought a pistol to work with him "on a daily basis." (Doc. 66-3 at 167). And he said that, on a single occasion (sometime between 2015 and 2017), Reagan lifted his shirt to reveal the pistol to Ellis. (*Id.*). Ellis could not remember whether Reagan contemporaneously said anything to him. (*Id.*) And he conceded that Reagan "didn't point [the pistol] at [him]." (*Id.*).

Applying the four factors, the Court finds that this incident—and, by

extension, Ellis's sole argument for relief—cannot support a hostile work environment claim. On the first factor (frequency), this singular incident is too isolated to constitute a discriminatory change in Ellis's employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (holding that offensive epithets spread over a two-year period were "too sporadic and isolated" to support a hostile work environment claim).

On the second factor (severity), the record evidence does not show that the pistol incident was severe enough to tilt in Ellis's favor. Reagan never pointed the pistol at Ellis. (Doc. 66-3 at 167). And there is no record evidence to suggest that Reagan contemporaneously made any threatening or racially offensive remarks. (*Id.*). Although possessing and flaunting a pistol in violation of UAB's workplace regulations could be dangerous, and it's certainly unadvisable, it is not an incident of the severity required to support Ellis's claim.

On the third factor, no record evidence supports a finding that the incident was "physically threatening or humiliating." *See Mendoza*, 195 F.3d at 1246. Again, Reagan did not point the pistol at Shine, and no evidence suggests that Reagan made any threatening or racially offensive remarks during this incident. His conduct did

not objectively amount to a physical threat. *See, e.g.*, *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1289–90, 1303 (11th Cir. 2012) (holding that jury could find "physically threatening" that two co-workers approached the plaintiff at night with a crowbar to ask if the plaintiff had reported other acts of racial harassment). And Ellis makes no argument that this incident was humiliating. *Mendoza*, 195 F.3d at 1246. So this factor weighs against him, too.

On the fourth factor, no evidence supports that the incident interfered with Ellis's job performance. And Ellis makes no argument that it did. So this factor also weighs against him.

In sum, the single incident which Ellis relies on is not "severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment." *Adams*, 754 F.3d at 1249. Because Ellis has abandoned any other factual bases for this claim, *see Resolution Trust Corp.*, 43 F.3d at 599, the Court may grant summary judgment to UAB.

**B.    The cumulative record evidence fails to establish objective hostility**

Giving Ellis the benefit of the doubt and considering evidentiary arguments that Ellis abandoned by failing to rely on them in his brief, the evidence still fails to show "a discriminatorily abusive working environment." *Adams*, 754 F.3d at 1249.

Ellis testified in his deposition that, between 2015 and 2019, he experienced:

(1) a white co-worker (Reagan) lifting his shirt to show Ellis a pistol sometime between 2015 and 2017; (2) white co-workers (Reagan and Hogg) making jokes about chickens and watermelon and calling Ellis "boy" in 2015 and 2016; (3) a white co-worker (Reagan) leaving dirty tissues in Ellis's office space in 2015; (4) a white supervisor (Creel) telling Ellis that he was "going to kill" him after Ellis sneezed on him in 2019; and (5) another white supervisor (Herrington) commenting about shootings in Birmingham and displaying a confederate flag in the background of his computer during a video meeting in 2020. These facts do not support a jury finding that Ellis's work environment was objectively hostile. *Mendoza*, 195 F.3d at 1246.

First, these events are still too sporadic and isolated to support the claim. *See Adams*, 754 F.3d at 1252 (explaining that seeing Confederate flags and hearing racial slurs "every day" were frequent enough); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (upholding jury finding based on evidence that the plaintiff received ethnic slurs "three to four times a day"); *McCann*, 526 F.3d at 1379 (holding that offensive epithets spread over a two-year period were "too sporadic and isolated" to support a HWE claim); *Fortson v. Carlson*, 618 F. App'x 601, 607 (11th Cir. 2015) (holding that nine incidents involving racially derogatory language over a two-and-a-half-year period were not frequent enough). There is no evidentiary indication that co-workers or supervisors hurled racially derogatory remarks or

insensitive jokes towards Ellis with the necessary frequency. And the other incidents are all one-off and isolated. As a result, there is not enough evidence for a jury to find that Ellis's co-workers or supervisors "frequently" harassed him. *Mendoza*, 195 F.3d at 1246. This factor weighs against Ellis.

Second, the evidence also does not portray "severe" conduct. *Id.* The cumulative severity of these events falls short of the threshold set out in Eleventh Circuit decisions. In *Barrow v. Georgia Pacific Corporation*, for example, an African-American employee testified that: (1) his co-workers displayed Confederate flags, wrote "KKK" in the bathroom, hung a noose on another employee's locker; and (2) his supervisor "repeatedly called him 'boy,'" called him "ni—er" three times in one year, and "told him two or three times that he was going to kick [the employee's] 'black ass.'" 144 F. App'x 54, 57 (11th Cir. 2005). The Eleventh Circuit held that these "allegations do not meet the standard of severe and pervasive harassment" necessary to support a hostile work environment claim. *Id.* at 58. If those allegations fell short, then the evidence here fails, too.[9] So this factor weighs against Ellis.

---

[9] It does not change the outcome that this case also involved a co-worker flaunting a pistol in front of Ellis. As explained in the previous section, Ellis's testimony about the pistol incident is does not constitute "severe" harassment. And it stands in contrast from *Jones*, where the evidence showed that co-workers "confronted" the plaintiff about his complaints to management "at night" brandishing "an object that could be perceived as a weapon" (a crowbar), along with evidence of harassing racist comments at work and co-workers leaving banana peels on the plaintiff's truck. 683 F.3d at 1303.

Third, the evidence does not amount to a "physically threatening or humiliating" experience. *Mendoza*, 195 F.3d at 1246. No evidence suggests that the pistol incident involved threatening language, aggressive conduct, or any other indicators of impending physical violence. Without more, a reasonable juror could not find that the conduct was physically threatening. *See Jones*, 683 F.3d at 1289–90, 1303 (holding that jury could find "physically threatening" that two co-workers approached the plaintiff at night with a crowbar to ask if the plaintiff had reported other acts of racial harassment). None of the other recorded incidents come close to a physically threatening altercation. And there is insufficient evidence that these incidents were humiliating. *Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1286 (11th Cir. 2018) (explaining that hearing racial slurs "every day" was humiliating). So this factor also weighs against Ellis.

And fourth, there is no evidentiary indication that these incidents affected Ellis's job performance. *Mendoza*, 195 F.3d at 1246.

In sum, Ellis has not showed that he experienced harassment that "was sufficiently severe or pervasive enough to alter [his] terms and conditions of employment." *Id.* His claim thus fails, and the Court grants summary judgment to UAB.

### III.    Disparate Impact

Ellis's final claim is disparate-impact discrimination. But this claim fails for the same reasons that the claim fails for Michael Shine's case. The Court therefore incorporates and adopts its disparate-impact analysis in Shine's summary-judgment opinion. (Doc. 85 at 24–28).

* * *

For the reasons above, the Court **DENIES AS MOOT** UAB's motion to strike (doc. 76) and will enter a separate order that **GRANTS** UAB's motion for summary judgment on Ellis's claims (doc. 64).

**DONE** on **December 30, 2021.**

_____

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE